Good morning, Your Honors. May it please the Court, my name is Gordon Atkinson, and I'm representing the Plaintiff and Appellant, Los Angeles Biomedical Research. For my argument today, first I would like to provide a very brief factual overview, and then a very brief high-level summary of the three legal errors that we believe were made by the District Court, and then I will go through each of those three in some more detail. Los Angeles Biomed is an institute, a non-profit institute, in Southern California that has very state-of-the-art research facilities and that has a mission to further the advances of scientists wanting to research into complex medical questions, as well as other community-based relief that they provide. One of the ways in which they raise funds, which is really no different than hundreds of other employers throughout California, is that they have their employees and researchers sign a patent and copyright agreement, often called an inventions agreement. Dr. White signed such an agreement in this case. In 1992 and 1993, Dr. White used the Los Angeles Biomedical facilities for the development of an aortic stent graft, including some very important inventive work that had not been performed before, work for which he later obtained patents. By the terms of the invention agreement, he was to give Los Angeles Biomed a chance to review and examine the work that he had done. He was to furnish them with complete information related to the invention, and he was to assign his rights to LA Biomed if requested. He did not comply with any of these three requirements. Thus, on a factual basis boiled to its essence, we have the defendant, Dr. White, failing to live up to his contractual requirements, and instead keeping his interests in the invented device entirely to himself and his colleague, Dr. Yu. So with that background, how was Dr. White able to convince a jury that he did not invent something at LA Biomed, and that he did not breach the inventions agreement? We submit, Your Honors, that this was based on three legal errors that were made by the district court. First was the agency instruction. By giving the agency instruction, when coupled with the instructions on conception and reduction to practice, the court, in essence, required the jury to find that Dr. White had done 100 percent of the inventive work by himself unless he could prove a formal agency relationship between himself and his colleague. The second instruction that we believe constituted a legal error was the corroboration instruction. By requiring LA Biomed to provide additional evidentiary corroboration of the sworn statement that he submitted to the Patent and Trademark Office, in essence, the court rewarded Dr. White's failure to provide LA Biomed with that precise evidence in 1993. Because he was able to leave the lab, having made an important invention, but yet disclosed none of it to LA Biomed, he deprived LA Biomed some years later of being able to provide the exact corroboration advice, excuse me, corroboration evidence that the court found was necessary. The third major problem in the court below related to the device instruction. And the court, in its instructions, failed to differentiate between the device that was invented at LA Biomed and any other device that happened to have the same name and to fit into that generic class of medical devices. Let's take it in reverse order. Why wasn't that issue waived? You presented a jury instruction on that issue at the beginning of the case, but when the formal jury instructions were submitted, you didn't submit, as I understand the record, a jury instruction on that issue. Why should we consider that on appeal? Your Honors, when the case was being prepared for the December 19, 2005 hearing, we had submitted a series of instructions, some jointly with Medtronic, but some on our own. And instruction 6, which we had submitted on our own under only LA Biomed's name, included the details of the device that we wanted the court to consider and that we wanted the jury to consider. The court came out and said, in essence, here we are, Medtronic's out of the case, I've read your instructions. He said, I don't like that instruction, quote, it's too complicated. And from that, we left the courthouse. And it was quite emphatic. When we left the courthouse, we were left with a very clear understanding that having submitted that instruction, he was not going to adopt it. He told us, point blank, it's too complicated. Instruction number 6. Instruction number 6. Furthermore, when we went to the charging conference, the court said any previously submitted instructions shall be deemed to have preserved your objections. So I would couple those two facts and say that the court was unequivocal in its rejection. Did the court use the word, I reject it, I'm never going to consider it? No, he did not. But we're not required, at some point when a court gives a strong indication that it's not going to accept an instruction, we're entitled to move on without irritating the court. But I mean, complicated is a bit ambiguous. It's like too many notes, isn't it? In Amadeus, the rejection of it. Too complicated, but I'm going to give it anyway? Or did he ask you to know what to make of that? I will find the exact words from that. In fact, I may have them right here. Going then in reverse order to the second issue, I take your point on the cooperation instruction, but why, in the context of this case, wasn't the giving of the instruction harmless error? I mean, what the admission said, if I'm reading it correctly, is that Dr. White did testing during the relevant period, and that seems to be undisputed. So what does the admission gain you? Explain to me the prejudice that, I guess, flowed from that particular instruction. Certainly. The declaration that Dr. White submitted to the Patent and Trademark Office contained four important admissions. It admitted that key work had been done at L.A. Biomed, it was performed personally by Dr. White, he reduced to practice the stent graft device that had been developed at L.A. Biomed, and that Dr. Yu was working under his instruction. By insisting that there be corroborating evidence, what the court did was allow the jury to reject that declaration, to not consider that declaration. Without that declaration, there was no corroborating evidence with respect to the overlapping of the grafts. The overlapping of the grafts was the key inventive piece. There were other key elements as well. There were many modifications made to the device at L.A. Biomed that allowed it to be overlapped successfully, but if the jury had no basis for believing that the device had been successfully overlapped at L.A. Biomed, simply because there wasn't corroborating evidence to his declaration, then the jury could say, it doesn't look to us like anything important was invented. That's why it was prejudicial. Go ahead. Okay. I will stick with the corroboration rule. Obviously the corroboration rule plays an important part in the patent law, because it should not be the case that the naked assertions of an inventor should be used by themselves to establish a date for conception or reduction to practice. The purpose of that is obvious and discussed in multiple cases. The purpose is to avoid fraud. It keeps unscrupulous inventors from looking out what's in the field and then picking a date that happens to be before anyone else supposedly conceived or reduced a particular device to practice, and then they become the first in priority. They become the person who becomes the listed inventor on the patent. But what happened here is that the court turned that on its head. Instead of being a circumstance where it prevented an inventor from making up a date, here it rewarded the inventor for not providing information to L.A. Biomed in this case. If Dr. White had done what was required by the inventions agreement, had shown the device, had shown his research, had shown everything that he did while at L.A. Biomed to L.A. Biomed, L.A. Biomed would have had a lot of corroborating evidence. But because he secretly withheld it, left, then filed for his patent applications, then filed a secret, as it is required to be under law, but filed a secret declaration with the Patent and Trademark Office, he removed the ability from L.A. Biomed to gather and retain corroborating evidence. So instead of punishing someone who's making up a story, it rewards someone who is making up a story. And that is simply not what the purpose of the doctrine is. And then we talked about the harm, but the harm really is that with those admissions, telling the jury point blank that you can disregard the declaration because of the lack of corroborating evidence was very, very prejudicial to L.A. Biomed, and it made it very hard for the jury to reach a conclusion with respect to the importance of that declaration. And furthermore, it was argued, the corroboration points were argued very strongly by counsel during the course of the trial. The agency point is also very, very important, Your Honor. Why was the court addressing agency? Well, because there's more than one person involved in the conception and reduction to practice of this advice. The evidence, the uncontradicted evidence that was before the court was that Dr. White had sworn in his declaration that Dr. Yu did certain work at his instruction. Dr. White testified that he and Dr. Yu worked together as partners and that what each of them did was for the benefit of the other. And they were both listed as co-inventors on the patent. So with that background, the notion, that meets the standards under patent law, that meets the standards for inventorship, whether you look at conception or reduction to practice, and there didn't need to be an agency instruction. But what happened instead was the court did give an agency instruction. It insisted on it over multiple objections by LA Biomed. And the court refused to give, so it gave an agency instruction and then refused to give the instructions on conception and reduction to practice that we had requested. In conception, the law is clear that for someone to be deemed an inventor by conceiving an invention, all they have to do is make a substantial contribution. That's true in the Ethicon case, that's true in the FINA case, and it is right in the model instructions developed by the Northern District of California for patent cases. Yet the district court rejected the substantial contribution language. This isn't purely a patent case. It involves the construction of a contract. Correct. So tell me why you think we ought to apply a patent definition, or import a definition from patent law as a means of construing this contract. Sure. The reason why it is important to look to the patent laws to understand this contract is because the contract uses two terms of art, conception and reduction to practice. Nowhere in either the agreement itself nor in the attached patent policy of the Institute does it have a definition. Those words are not defined. They are understood in the field of inventions, in the field of patent law, to have very specific meanings. And so without looking to that law, there's simply no basis for, there's no community understanding generally about what those words mean outside the specific area of people making inventions and trying to prove priority under the patent laws. That's the only place the court could look. And both sides, both Dr. White's counsel and L.A. Biomed's counsel relied on the patent laws in what they submitted to the court. And the court relied on patent laws in what's in its own instructions. So I think that both the court and both parties recognized that you had to draw from the field where you have inventorship, where you have people conceiving inventions, where you have people reducing inventions to practice. Reduction to practice has a similarly loose standard. The substantial contribution language under the conception prong is much looser than an agency standard. And similarly in the reduction to practice, as long as two people are collaborating and working closely together, that meets the requirements. Under the Cooper v. Goldfarb case, it is sufficient for people to be working closely together in reducing a device to practice for each of them to be deemed an inventor, for them to be deemed co-inventors. So the prejudice here is that when you have the agency instruction and you have, and agency is a body of law that's important for a lot of reasons. If you want to determine whether someone is liable for the tort of another, you look to agency law. If you want to decide whether a party is bound by a contract that their agent entered into, you look to agency law. But requiring a formal agency relationship to determine whether the work of collaborators on an invention have a joint interest in that invention, it's not in the case law and it's simply unnecessary. It creates too high a hurdle. You couple that with the fact that the district court did not give the requested conception and reduction to practice arguments that incorporated the most current thinking in terms of what is necessary, the quantum of work necessary before someone can be deemed an inventor, and the jury had virtually no choice but to find for Dr. White. There was no formal agency relationship. There was no signed agreement. There was nothing that looked or smelled like a formal agency relationship. But under the case law, under the model rules, that is simply not required. You have about four minutes left. Do you want to say something? I would like to say that, Your Honor. All right. Thank you. Good morning, Your Honor. May it please the court, my name is Mark Hadad and I represent Dr. Jeffrey White. Let me begin with the agency issue where we just left off, because that's the issue that appellants use to frame this appeal. We think that the agency instruction was the correct instruction as a matter of law, because the jury needed some frame. As a matter of agency law? No, well, as a matter of agency law, but as a matter of assisting the jury have the framework it needed, which I think both sides acknowledge. The jury needed some framework to make sense and to assess the work that Dr. Yu did. Well, your side's position was that Dr. Yu was not an agent of Dr. White. That's correct. And it followed from that that you win. I mean, it seems to me that the agency thing was an entire red herring in this case. It was dragged in front of the jury's nose and did nothing but distract them from the essence of patent law. Yes, this may have been a contract case, but at the bottom it was a question of contract. And if you look at the patent and copyright agreement, it talks about the institute's patent and copyright policy, and the patent and copyright policy talks about construing all of these things in terms of patent or copyright laws, court decisions of the United States. I don't see what agency had to do with it if the patent law says a substantial contribution gives you an undivided ownership interest in a patent. Here's what it had to do with it, Your Honor. Dr. White was the signatory to the contract, not Dr. Yu. And the jury had to make some sense of what significance Dr. Yu's work at L.A. Biomed had. I don't think so. The question is whether Dr. White made a substantial contribution to the creation of the patent. And if he did, he owns an undivided interest in it, what Dr. Yu did or didn't do. Well, but here's, I think... Am I wrong about that? I mean, if you make a substantial contribution, you have an undivided ownership interest in a patent. That's a correct statement of law. And what difference does it make what Dr. Yu did or didn't do? Let me respond with a hypothetical that I think can show the Court why using inventorship as the rubric here proves too much. If Dr. White had stayed home in Australia, Dr. Yu had come over to L.A. Biomed... Yeah, but that's not what happened. The hypothetical's not helpful at all. It's not what happened. You have to deal with what happened. Dr. White did come over, and he did file a document saying that he reduced this to practice at L.A. Biomed. But if I may finish the hypothetical, I think it could show why there needs to be a line drawn here. The reason is that if Dr. Yu had done whatever work he did at L.A. Biomed, not subject to an agreement, and then Dr. Yu and Dr. White had later gotten together and collaborated on an invention and gotten a patent, L.A. Biomed clearly would not be able to point to Dr. Yu. What happened that is so dissimilar and shares none of the attributes of the factual situation and circumstances in this case? I mean, it's not... Oh, well, go ahead and keep arguing. I mean, it's not what happened. That's true, and we concede that it's not what happened. But the reason it's... How is it helpful to pursue that avenue? Because L.A. Biomed was trying to use Dr. Yu's work. You don't instruct in cases based on hypotheticals that have nothing to do with the case. You instruct based on the facts of the case. But Dr. Yu... The case was substantial contribution. Patent law involves. It's a contract. Who owns it? If you make a substantial contribution, then it seems to me that L.A. Biomed has an honest claim against Dr. White's part of the patent. But it begs the question... You argued that Yu was some outside guy, and therefore his participation in any respect whatsoever deprived the L.A. Biomed of its case. I think it's a complete red herring. Well, I understand the court's point, but I think our point is saying that Dr. White made or didn't make a substantial contribution begs the question of do you look to Dr. Yu's work to decide whether Dr. White conceived or reduced to practice an invention? By refusing the instruction on substantial contribution, you deprive the jury of the entire picture of what the patent law is. I mean, it seems to me, and I guess you don't really contest that we ought to construe these terms of art as terms of art in the contract and not by any other, I guess, construction. Well, we, both sides agreed that the terms conception and reduction to practice had to be construed as they're construed for purposes of patent law. Okay, then why should the district court have instructed the jury on what they meant in patent law? Well, the conception instruction that the court gave was absolutely correct. Both sides can read the cases. We read the cases, and we presented an instruction, which is essentially the instruction the court gave, that conception is a definite and permanent idea of the complete invention. Now, that's a correct statement of what it means to conceive an invention. Now that was a perfectly correct statement under patent law, and the only really dispute here is should the court have gone on and given an instruction there about inventorship and what it takes to become an inventor, which is to make a substantial contribution to the conception or reduction of practice. Now that was not an appropriate place to talk about inventorship, and that's for two reasons. First, inventorship was not at issue. There was no dispute that they're both inventors. And second, the substantial contribution, if it has any relevance to this case at all, goes to what the possibly patentable device is, because it was up to L.A. Biomed, if it wanted to, to say to the jury, you know, look, he doesn't have to come away from L.A. Biomed from his work there with a conception of a complete patented invention. He could have a conception that was complete and definite of his contribution to whatever it was. So if he conceived a device that later becomes patented as, you know, a component of a broader device, well, if that case was litigated on an heirs to issue inventorship, then he would be an inventor. But that's not how they ---- But the problem, I think, in this case is, and I share some of Judge Trott's concerns, is that the agency theory then morphed into this large issue in the case, which seemed to take over the defense. How would you, hypothetically, if you'd been denied the agency instruction and you had the substantial contribution instruction given as proposed, how would you have argued the case to the jury? We would have eliminated probably one and a half pages of the closing argument and said everything else that we said in the closing argument. And this is critical, because our client and Dr. Yu had worked on, conceived, every element that L.A. Biomed and its appellate brief wants to argue is critical to this invention. They conceived all of that in Australia long before or well before they came to the United States. We would have pointed to a number ---- really, all of the same evidence that we spent almost the entirety of the closing ---- Really, what did agency have to do with it? I found it confusing to be injected in the case, and it did seem to ---- Here's what it ---- here's all that it had. About the only evidence of conception that L.A. Biomed could point to were sketches in the notebook of Dr. Yu. He was working on some various designs that had this Z wire form and so forth, extending over the edge. And so for purposes of conception, they wanted to say Dr. Yu's notebook shows that he and by extension Dr. White came up with this idea while he was at L.A. Biomed. Now, Dr. White's response to that was no. Here's the evidence that I discussed a device with a Kirby wire form, quote-unquote, with Dr. Wilson of UC Irvine earlier in 1991. Here's a photograph of the device that has all of these features, the Z stand with the Kirby wires extending over the edge, from an operation in which I used this device in Australia in October of 1992 before I came over to L.A. Biomed. Here's the letter that I sent to Dr. White, Rodney White of L.A. Biomed, with my protocol that lays out that I'm going to be looking at Z stent gag graphs, which he sends in November 16 before he comes over. Just to set forth why he's going to be using the facilities. And the sites to this, all of these are in our statement of the case. So in short, the presentation was we conceived, we discussed, we designed, we built, we used in an actual human operation, and we advised L.A. Biomed of this Z wire form gag graph device before we ever came over to L.A. Biomed. So the conception did not occur at L.A. Biomed, and that was the theme. That was what was extensively argued to the jury. We put in the supplemental excerpts of record the entire closing argument that Mr. Abrams gave because the court can see if it reads through that closing argument that the agency issue was effectively a blip. It was a couple of paragraphs. Maybe it takes up a page or page and a half in the closing, but it is not the central focus because there just wasn't that much to it. It was what sense are you going to make of Dr. Yu's notes, and we said Dr. Yu testified and Dr. White testified that when Dr. Yu was making those notes, those were his own ideas, and they were not at Dr. White's request. Dr. White didn't know he was working on his own sketches. Dr. Yu didn't understand himself to be doing those sketches. I mean, there was no way he was going to be considered an agent. That was plain from the record. Wouldn't you agree? Well, under the instruction, I don't agree with that, Your Honor, because under the instruction that was given, agency could be implied through the conduct of the individuals, and in this case the evidence was that Dr. White had arranged for Dr. Yu to work as a volunteer. He wasn't paid by L.A. Biomed. He was working as a volunteer and essentially going forward with the animal testing studies, which they needed the L.A. Biomed facilities to do, and these animal testing studies were not part of a reduction to practice. They did not involve overlapping the devices. They were a sort of safety test to see how the devices would perform in animals over time. Are you arguing now that it's clear that Yu was White's agent? No, that there was evidence from which a jury could have concluded that Yu was White's agent, because White arranged for him to have access to L.A. Biomed. Your side argued pretty vociferously that Dr. Yu played a significant role. What did Dr. Yu tell you when he sat on the stand? These were his designs, his designs. He built the graphs. He designed the wire forms. No one told Dr. Yu. He was clearly working on his own. He clearly designed these devices, and then you concluded from that that all of a sudden you prevented the jury from finding, for finding for L.A. Biomed. I think, Your Honor, we would distinguish between the argument we made, which is what we made about whether the designs, the conceptions. You made the same statement, an opening statement, too. Correct, Your Honor, but our point is that as the jury was instructed, there was no requirement that there be a formal agency relationship in the sense of a signed contract. The conduct, the implied conduct was a basis for finding an agency relationship under the instruction, and L.A. Biomed could and did argue that under the circumstances that led to Dr. Yu's being at L.A. Biomed and the undisputed collaboration of the two on the animal testing studies, that he was there as an agent. They really just had to resolve a question, really two questions. First, was Dr. Yu's hand-drawn notes of the design of an overlapping GAD graph, which isn't what was put in the animals, but was a separate overlapping device, was that done pursuant to the authority of the judge, or did it matter? Or had all of that been, the essence of it been conceived and designed in Australia before they got there? Do you think the corroborating instruction was appropriate? Yes, Your Honor, and there What was the purpose of the corroboration instruction? Why does it exist, and for what purpose is it used? Look to paragraph 11 of the declaration. There, Dr. White, who is the person who claims to have reduced this device to practice in the United States, expressly asserts, I reduced this device to practice in Long Beach in 1993. Now, that's a statement of an inventor claiming to have reduced something to practice. That alone does not stand without corroborating evidence. For what purpose? I mean, it seems to be that the corroborating instruction exists for purpose A, and you managed to get it used for purpose B that has nothing to do with A. The corroboration instruction is completely wrong. What's going on with this declaration in this case? If the court looks to the language of the corroboration instruction, as the jury was actually instructed, the instruction put a burden on Dr. White. It said, quote, the person who claims to have reduced to practice a device must have independent evidence. That's to prevent an inventor from using his own uncorroborated testimony to make certain claims in a case. It was not intended to prevent somebody else from using Dr. White's statements to prove a particular point in a case like this. It seems that it was absolutely used for a purpose that it wasn't created for. Well, we disagree with that, Your Honor, because Dr. White's defense centrally turned on the fact that he did not reduce this invention to practice at L.A. Biomed. He said he reduced it to practice a year later. I'm sure you have this conflicting statement that he did. Well, there we look to paragraph 9, because they wanted to argue that paragraph 9 was an admission against interest about reduction to practice. Paragraph 9 says nothing about reducing this invention to practice. It is not an admission that he reduced something to practice. It seems to be an admission that he engaged in conduct that by contract he was required to share with L.A. Biomed. But he shared, L.A. Biomed was fully aware of all of the animal testing. And to the extent we're talking here about bench testing that they claim they were unaware of, it was not set forth in this declaration as constituting a reduction to practice. It couldn't have been because it was open air. It wasn't in a vessel. It wasn't in a body. It wasn't the invention as it's intended to be used. So it couldn't have been a reduction to practice. It wasn't alleged to be a reduction to practice. So if you look at the instruction as it was written, and as it applies to paragraph 11, which is the only place in which the person claims to have reduced something to practice, it's a perfectly correct, absolutely correct instruction. The only issue is should there have been some follow-on language saying, by the way, when you look at paragraph 9, there doesn't have to be corroboration for an admission that he did bench tests that didn't amount to a reduction to practice. Well, that's a kind of a convoluted sort of instruction to try to craft. And that's exactly what the district court said at excerpts of record page 401. The court said, look, this is very convoluted. How am I supposed to make sense of this? And L.A. Biomed had two opportunities to come back with a supplemental instruction tailored to paragraph 9 if it wanted one. It could have done it right there at excerpt of record 401, or it could have come back later after the charging conference with a supplementary submission, which the court expressly allowed the parties to make and which L.A. Biomed took advantage of to clarify some of its requests. And it could have tried to present a non-convoluted way of having a distinction made to the jury between paragraphs 11 and paragraphs 9. And they didn't do that. So all we have is a request that a corroboration instruction not be given or be given differently. But the corroboration instruction is correct. It puts the burden on Dr. White as to paragraph 11, which is the only paragraph it applies to on its face. And there's no meaningful alternative carved out for paragraph 9. Let me briefly address, if I may, the waiver issue for the theory of the case. I think the court identified the core problem that L.A. Biomed initially submits with Medtronic a request for a definition of the possibly patentable device as having these. The Z-ring and O-ring, that whole controversy, the Z-ring? Yes, the Z, right, and it wanted It's an instruction number 6? Correct. That's an instruction number 6. Did the court say if you previously submitted an instruction, you don't have to bring it up again? Three months later, yes, but at the time But here's the step that's missing, that is critical on this point, we think. The court says come back, now that Medtronic's out of the case, understand the issues are going to evolve, the instructions will evolve, come back in another month and resubmit jury instructions. Parties come back on January 17th and draw the court's attention to excerpts of record at pages 54 to 59, the supplemental excerpts of record at 55 to 59, that's the L.A. Biomed's brief and we cite it on page 19 of our brief, and L.A. Biomed argues at length to the court that the definition of a possibly patentable device should not be limited to the claims and the patent, it should be a broad definition. We, Dr. White, argued the exact opposite and our brief follows at pages 60 to 66, and we said, look, you've got to define this possibly patentable device narrowly, it has to be with reference to the claims, because if you look at the complaint, this is all about who has ownership in these claims and the patent, that's pages four and five of the excerpt to record, that's the complaint. So our position was have a specific definition, point to the elements of the device, make the jury decide whether that device with those limitations was conceived or reduced to practice at L.A. Biomed. L.A. Biomed said no, don't do that, we don't want something specific, we want a general statement of an overlapping GADGRAF device, that's what it should be. We commented in our brief at SCR 62, we said this is a newfound desire on their part to have a broad definition. So they didn't just tuck their tail in after hearing guidance from the court that the first proposal they had was too complicated, they went whole hog the other direction. We, on the other hand, didn't feel like we were constrained to avoid a narrow definition, we asked for one. So it was on their strenuous argument that the court went down the road of a general definition. He ruled in their favor on this issue, and I think that's at docket 337, also at excerpts of record, page 39, footnote one, the court can see, the court rules against us, against our proposed instruction, and for L.A. Biomed's general instruction. So for L.A. Biomed to come now to the court and say we lost our opportunity to try this on our theory of the case, we think is 100% wrong. They were able to argue within the construct, within the definition that the court gave, exactly their theory of the case, all of the particular elements they thought were significant, they presented all of that to the jury, all of their arguments this morning were squarely presented to the jury. We don't think the instructions interfered in any way with the presentation of the case. This case was really decided on the core issues of did the jury believe Dr. White and believe his written documentary evidence of what he and Dr. Yu accomplished in Sydney before they  So I would like to ask you, counsel, you're over your time, but I wanted to make sure you had a chance to present your argument on that last issue. Thank you. Thank you, Your Honor. I would first like to respond to the question that you asked earlier of what precisely the court said in rejecting the instruction about the specific gag graft, the Z-ring rather than the O-ring. And I'll just, I'll read it. I absolutely concede it is the toughest of our waiver arguments. I think there is no waiver argument whatsoever with the court. Your time is running out, so why don't you get to what the court said. For the party's benefit, and this is at Excerpt of Record 189, for the party's benefit, just so you know, in preparing final instructions, the court was prepared to deny both proposed of breach of contract, which is disputed instruction number two, and the proposed instructions on essential factual elements and breach of contract, essential factual elements, which are disputed instructions four and five. And the court was also prepared to deny LA Biomed's proposed disputed instruction six, our invention. I think it's too complicated. That gives you some idea. You're going to need to put your heads together and come up with something. So by telling us to go away and come up with something, because what we've proposed is too complicated, I think it fits within the case law and was sufficiently definite to not be a waiver. I would like to move on to the other issues, because I do think I do as I take a look at the motion for a new trial to see if you raised this issue in the motion for a new trial. I've now read it three times. You didn't raise this in a motion for a new trial. We did not, Your Honor. And so, I mean, if it's so important now, why wasn't it in the motion for a new trial? We didn't think that it would be persuasive to the district court because the district court had a very strong point of view on that. Maybe tactically that way of making a record. Maybe that was tactical error on our part, Your Honor. I would concede that, but it does not constitute a waiver nonetheless. But I understand your point. It doesn't sound all that important if you don't even put it in your motion for a new trial. Understood. I will only address a few points that were addressed by Mr. Haddad. He did state correctly that the conception instruction had some valid basis in patent law, but it was incomplete. And I think Your Honor's picked that up. The sentence that is provided is accurate. What is not accurate is it's made inaccurate, makes the entire instruction inaccurate by omission. The failure to provide the substance. That's true. Why did it matter to the jury? I mean, at the end of the day, why do you believe the jury just didn't correctly determine who did what when? They could have correctly determined who did what when, but when the court specifically says to them, if you don't find agency, then you have to disregard Dr. Yu's work, that is unbelievably confusing. I don't even know what it means today when the court says that. Because Dr. White has to conceive of the entire invention. Does that mean when Dr. White conceived the entire invention, he had to disregard Dr. Yu's work? That certainly would make no sense. And Dr. White's counsel made a huge deal about this. This was not just a page and a half from their closing. It's not just a blip. They went on about how Dr. Yu was off in his hotel, how his work shouldn't be attributed to Dr. White. It certainly didn't prevent us from arguing the agency. I never said that we were prevented from arguing agency. What I said was it gave the jury an easy way out. All they had to do was conclude that the agency relationship did not exist. They ignored Dr. Yu's work. They never can conclude that Dr. White did everything by himself, and case closed. We lose. I also need to point out, I was quite surprised that counsel, three separate times, said to your Honor that L.A. Biomed's case was based on a few pages from the notes of Dr. Yu. A few sketches and a few notes. He said that three separate times. That is absolutely not true. If you look at pages ER88 to ER106, those are all Dr. White's notes. And if you look specifically at excerpt of record page 93, you'll see Dr. White's drawing of a Z stent graft. And again, I reiterate, there are no pictures, no drawings of Z stent grafts in Australia or anywhere else in the world at any other time other than at L.A. Biomed. And I think that speaks volumes. So it's not just a few sketches by Dr. Yu that we're concerned about. With respect to the corroboration, I think your Honor's hit it on the head. The only thing I would add to that is that counsel said, well, in the declaration submitted to the PTO, he only said, Dr. White only said reduced to practice in paragraph 11 when he was referring to a different institution. I don't frankly care when Dr. White uses the magic words reduced to practice. He's not a lawyer. He does not determine when something's not. Paragraph 9 is critically important. And I don't care that it doesn't use the words reduced to practice. It said that the testing concluded that one graft could be supported within another. It also said that the graft that he was testing at L.A. Biomed, and this is critical, had the features of the patented invention, the features that were in the patent application and that were later in the patented invention. And if you see Dr. White's and L.A. Biomed, which is at page 14 of our opening brief, and you compare them to the pictures in the patent application, they are identical. And there's no evidence from anywhere else that that invention predated L.A. Biomed. Thank you, counsel. Thank you. Thank you both for your arguments. It's an interesting case, and we'll take it under submission and we'll be adjourned for the morning. Thank you.
judges: Ferguson, Trott, Thomas